**UNITED STATES of America, Plaintiff,**

v.

**L. L. MAJURE and Mrs. L. L. Majure Co-Partners, d/b/a L. L. Majure Transport Company, Defendants.**

**Civ. A. 574.**

United States District Court
S. D. Mississippi, E. D.
July 5, 1957.

Robert E. Hauberg, U. S. Atty., Edwin R. Holmes, Jr., Asst. U. S. Atty., Jackson, Miss., Craig Kennedy, Atty., U. S. Dept. of Justice, Washington, D. C., for plaintiff.

Snow & Covington, Meridian, Miss., Watkins & Rea, Washington, D. C., E. David Haigler, Birmingham, Ala., for defendant.

MIZE, District Judge.

During World War II, from September 1943 to August, 1944 defendants transported aviation gasoline for plaintiff from Port Birmingham, Alabama to Craig Field, near Selma, Alabama. Plaintiff's amended complaint seeks to recover $18,296.67, which is a portion of the total transportation charges paid by plaintiff to defendants for the transportation service rendered.

The material facts are these: During World War II plaintiff maintained and operated military airfields at Courtland, Alabama, Craig Field near Selma, Alabama, Maxwell and Gunter Fields near Montgomery, Alabama, Tuskegee, Alabama and Columbus, Mississippi. In order to secure a constant and uninterrupted flow of aviation gasoline to these fields plaintiff bought and took title to aviation gasoline in the Texas City, Texas area. To transport the gasoline so purchased plaintiff entered into a contract under the provisions of the First War Powers Act of 1941, 50 U.S.C.A. Appendix, § 601 et seq. and Executive Order 9001, issued December 27, 1941, 50 U.S.C.A.Appendix, § 611 note, with Southport Petroleum Company of Delaware. Under the terms of the contract Southport undertook to transport the gasoline for plaintiff from the Texas City area to the six airfields named above. The contract provided for transportation by barge as far as Port Birmingham, Alabama and thence by tank truck to the airfields. The transportation by truck was to be effected by Southport or by such other person as plaintiff might direct. The contract fixed specific rates per gallon for the entire haul from Texas City to the specific airfields named in the contract.

On or about August 15, 1943 Southport commenced the performance of the contract, including that portion of it requiring Southport to transport the gasoline by tank truck from Birmingham, Alabama to Craig Field, Alabama. However, shortly thereafter, Southport was forced to cease to perform the truck transportation because the Interstate Commerce Commission, exercising its jurisdiction under Section 207 of Part II of the Interstate Commerce Act, 49 U.S.C.A. § 307, rejected Southport's application for authority under the Act to engage in that truck transportation.

Southport being thus unable fully to perform its contract, plaintiff, exercising its right under the contract to cause the truck transportation to be done by someone other than Southport, requested defendants to transport the gasoline from Port Birmingham, Alabama to Craig Field, Alabama. Defendants undertook to do so at a rate of 34¢ per 100 pounds. They sought and procured from the Interstate Commerce Commission temporary authority as a common carrier in interstate commerce to transport gasoline on United States Government bills of lading in bulk in tank trucks from Port Birmingham, Alabama to Craig Field, Alabama at a rate of 34¢ per 100 pounds. Said temporary authority was extended from time to time by orders of the Interstate Commerce Commission. The Commission's orders were issued upon applications of defendants to the Commission which were supported in writing by plaintiff. Ultimately, the Commission issued defendants a permanent Certificate of Public Convenience and Necessity to engage in said transportation as a common carrier in interstate commerce at a rate of 34¢ per 100 pounds. Defendants have held such permanent authority continuously since it was granted and now hold it.

The actual method of operation was this: Plaintiff purchased and took title to large quantities of gasoline in the Texas City area. It tendered the gasoline so acquired to Southport. Southport moved it by barge to its Warrior River terminal at Port Birmingham, Alabama where it was unloaded into storage tanks owned and operated by Southport and then reloaded from the storage tanks into tank trucks owned and operated by defendants and carried by them to Craig Field, Alabama. The process of unloading into storage tanks and reloading into tank trucks was virtually continuous. Witness C. R. Wilder, employed by Southport as terminal superintendent at its Warrior River terminal during the period in question, testified that the operation was carried on 24 hours a day,

seven days a week and that it was "as continuous as the thing could be". A barge load of gasoline arrived at the terminal almost every other day and trucks were at the terminal loading gasoline all or some part of the 24 hours in every day. That there was a continuous through-put from barge to storage tank to tank truck is further evidenced by the fact that the toal capacity of the storage tanks was 1,764,000 gallons while movements to the airfields were in the neighborhood of more than two million gallons per month.

Allotments to the various airfields were made monthly by means of directives from plaintiff sent before the beginning of each month to Southport. While the directives making the allotments characterized them as estimates and stated that they were subject to change, such changes as were made simply re-divided the monthly quantities among the airfields named in Southport's contract with the plaintiff. On at least one occasion a firm allotment of gasoline to a particular airfield was made before the gasoline left Texas City. All of the gasoline purchased by plaintiff and then delivered to Southport in the Texas City area for transportation pursuant to Southport's contract with plaintiff was purchased for use at the six airfields named in the contract. Plaintiff did not intend to consume any part of it at Port Birmingham, Alabama and none of it was in fact consumed at Port Birmingham, Alabama. Plaintiff did not intend that any of it remain in storage at Port Birmingham, Alabama and none of it in fact remained in storage in Port Birmingham, Alabama. On the contrary, it was merely put through the storage tanks at Port Birmingham, Alabama to facilitate loading into trucks and this was done as continuously and as rapidly as possible. The only reason for loading the tank trucks from the storage tanks rather than directly from the barges was that it was not practicable or feasible to do the latter. Heavy pumping equipment was required to lift the gasoline from the

barges into the storage tanks, whereas it flowed by gravity from the storage tanks into the tank trucks. The capacity of the barges ranged from 350,000 to 630,000 gallons each. The capacity of the tank trucks ranged from 3,000 to 4,500 gallons each. The barges were equipped with 10 inch lines or hoses for pumping the gasoline from them into the storage tanks. These lines were too large for use in loading tank trucks.

As defendants' tank trucks were loaded they were sealed with Government seals as directed by plaintiff and Government bills of lading were issued naming the United States as both consignor and consignee. In the usual course of their business defendants presented plaintiff with bills for their charges for transporting each tank truck load. The charges were computed by defendants on the basis of their rate of 34¢ per 100 pounds of gasoline. Plaintiff paid defendants' charges as so computed.

Several years after World War II was over plaintiff's agent General Accounting Office audited defendants' bills. As a result of the audit it concluded that defendants' rate of 34¢ per 100 pounds was too high, that a rate of 19¢ per 100 pounds was reasonable, and made demand on defendants for the difference. Defendants refused the demands and this suit followed.

Plaintiff's position in this Court is that defendants, in moving gasoline as described above, were operating in intrastate commerce in Alabama and that the applicable intrastate rate for such transportation was 19¢ per 100 pounds. In fact, plaintiff concedes that if defendants were in fact rendering transportation service in interstate commerce they are entitled to judgment. The 19¢ rate plaintiff claims to be applicable was the rate published by various other motor carriers than defendants as applicable to the intrastate transportation of petroleum products from Port Birmingham, Alabama to Selma, Alabama and was filed by them with the Alabama Public Service Commission as required by the Motor Carrier Act of Alabama. However, defendants at no time published or filed with the Alabama Public Service Commission any rate for the transportation of any commodity from Port Birmingham, Alabama to Selma, Alabama or to Craig Field, Alabama. In fact, defendants had no authority from the Public Service Commission of Alabama to render transportation service in intrastate commerce between Port Birmingham, Alabama and Selma, Alabama or Craig Field, Alabama. Absent such authority they could not render transportation service between those points without violating the law of Alabama.

■ At the outset the difficulty with plaintiff's contention is twofold. In the first place, to adopt it the Court must conclude that during the entire period in question plaintiff was openly and continuously violating the law of Alabama and that the Public Service Commission of Alabama shirked its duty to enforce the law. These are conclusions not lightly to be indulged.

In the second place, to adopt plaintiff's contention, the Court must further conclude that the Interstate Commerce Commission acted wholly beyond its jurisdiction and exercised authority it did not have. As has been seen, at the request of and with the written support of plaintiff, defendants sought and procured authority from the Interstate Commerce Commission to perform the specific transportation service rendered plaintiff. The Interstate Commerce Commission not only twice granted defendants temporary authority but ultimately granted them permanent authority to render this service. The record shows that the nature of the total operation of which defendants' transportation by tank truck was a part was fully explained by plaintiff's agents to the District Supervisor of the Bureau of Motor Carriers of the Interstate Commerce Commission in Birmingham, Alabama before the operation commenced, that he was of the opinion that defendants' part of it was transportation in interstate commerce, and that his opinion was confirmed by his superiors at the Interstate Commerce Commission in

Washington. Moreover, an implicit but nonetheless indispensable finding by the Interstate Commerce Commission in granting defendants authority to perform the transportation service described was a finding that their service was transportation in interstate commerce. Unless the Commission had implicitly or explicitly so found it would have had no alternative but to reject defendants' applications on the ground that they sought the issuance of orders beyond the jurisdiction of the Commission under the Interstate Commerce Act. Plaintiff having supported those applications, they having been granted, the transportation service having been rendered, and defendants having been paid at the rates prescribed for that service, it might well be said that plaintiff is estopped from coming forward years later and asserting that the transportation service was not in fact in interstate commerce. In Callanan Road Improvement Co. v. U. S., 345 U.S. 507, 513, 73 S.Ct. 803, 806, 97 L.Ed. 1206, the transferree of a certificate of public convenience and necessity for water carrier services issued by the Interstate Commerce Commission, having sought approval of the transfer, was held estopped to deny the Commission's power to issue the certificate. The Court said:

> "The appellant cannot blow hot and cold and take now a position contrary to that taken in the proceedings it invoked to obtain the Commission's approval."

██ ██ The Court finds and concludes that the transportation rendered by defendants was transportation in interstate commerce under Part II of the Interstate Commerce Act, 49 U.S.C.A. § 301 et seq. The Courts and the Interstate Commerce Commission have held on numerous occasions that the question whether particular commerce is interstate or intrastate is to be determined by "the essential character of the commerce". Atlantic Coast Line R. Co. v. Standard Oil Co., 275 U.S. 257, 48 S.Ct. 107, 72 L.Ed. 270. The most important factor in determining this "essential character" is the "fixed and persisting transportation intent of the shipper at the time of shipment". Ex Parte No. MC–48, Determination of Jurisdiction over Transportation of Petroleum and Petroleum Products by Motor Carriers within a Single State, decided by the Interstate Commerce Commission on March 7, 1957. The intent of the shipper is to be ascertained from the "bundle of circumstances" that surrounds the movement. What does the bundle consist of in this case?

1. Plaintiff owned the gasoline at all times. It bought and took title to the gasoline in Texas before any transportation was commenced, shipped the gasoline to itself and consumed it itself.

2. Plaintiff contracted with Southport for the transportation of the gasoline from Texas to six specific airfields named in the contract.

3. The precise period of time during which Southport was obligated to transport the gasoline, the maximum amount it was to transport and the rates for transportation to each of the named airfields were set forth in the contract.

4. Defendants performed that part of the total obligation of Southport under the contract that Southport was unable to perform, i. e., the truck transportation to Craig Field.

5. The gasoline was in fact transported to the airfields named in the contract.

6. The gasoline did not come to rest in storage tanks at Port Birmingham, Alabama for any appreciable length of time.

7. The gasoline was not processed or altered in any way at Port Birmingham, Alabama or at any other point in transit.

8. The gasoline was not stored in Southport's tanks at Port Birmingham, Alabama, but rather put through those tanks for the purpose of enabling its transfer from barge to tank truck.

Plaintiff's pattern of operation was thus sharply different than the usual pattern in the shipment, storage and distribution of petroleum products. The usual pattern is seen in the findings of fact of the Interstate Commerce Commission in Ex Parte No. MC–48. That was an investigation action instituted by the Interstate Commerce Commission "for the purpose of determining our jurisdiction over motor carrier transportation, within a single State, of petroleum and petroleum products, in tank vehicles, which have had a prior movement by rail, pipeline, motor, or water from an origin in a different State." The Commission found that such transportation *"as ordinarily performed"*, is in intrastate commerce. The Commission found the ordinary performance of such transportation to be as follows:

1. Products are schedules for shipment to terminal storage so as to maintain a supply adequate to meet estimated area requirements. "These estimates are predicated on the historical area pattern, with consideration being given to loss or addition of customers, contemplated percentage of increase or decrease in demand, seasonal variations, inventory buildup or depletion, and other anticipated influences such as advertising and sales promotion campaigns. The time in storage of any given quantity varies substantially between terminals and is dependent upon many different factors such as the type of product, the type of period or season, and the method of supply." (Compare Findings 3, 6, supra.)

2. "No particular quantities are shipped against specific orders and no designated ultimate destinations are known when the products leave the initial points of origin prior to the pipeline or water movement." (Compare Finding 2, supra.)

3. While some shipping companies have annual contracts with dealers, consumers and distributors, these contracts are cancellable on 30 days notice and merely specify minimum and maximum quantities. Actual volumes purchased are not related to the contract minima or maxima and "rarely are any specified quantities adhered to." (Compare Findings 1, 3, supra.)

4. "Pipeline and marine deliveries come to a definite rest at all terminal storage points for indefinite periods before being independently reshipped. There appears to be neither any necessity, purpose, nor intent to ship products through terminal storage to interior points or ultimate consumers under any through arrangement or method involving a continuity of transportation." (Compare Findings 6, 2, 3, 4, supra.)

5. "The average over-all turnover from terminal storage for one of the large shippers along the Atlantic seaboard is approximately 5.5 times per year and for the midwestern area approximately 5.8 times per year. For the year ending May 1, 1955, a breakdown as to individual product turnover for this shipper in the midwestern area shows a turnover rate for gasoline of 7 times per year, for burning oils–3 times, for distillates–5.7 and for residuals–9.2." (Compare Findings 6, 8, supra. A complete turnover here at least once a month and at times as often as twice a month.)

6. "The consistent purpose of the shippers entails nothing more than the maintenance of a fixed amount of product at the pipeline and marine terminal storage from which they may locally market, sell, allocate, and ship as the demand therefor is manifested." (Compare Findings 2, 3, supra.)

7. "The products of various petroleum companies of the same type and grade are commingled with a complete loss of identity while in transit and in storage. Frequently the products are further processed by the addition of certain additives at the time of removal from storage or during the process of shipment beyond." (Compare Finding 7, supra. No commingling here of different products or of products owned by different persons.)

8. "At the time of the initial tender for interstate pipeline or water move-

ments the shippers do not know the ultimate destination of any given quantity of their products * * * In fact, except in the case of one pipeline * * * there is no perceptible effort on the part of the original shipper to establish a persisting intent or to perfect a through movement by means of any type of through-rate arrangement." (Compare Findings 2, 3, 4, supra.)

9. The transactions may be likened to "the deposit of money in a bank wherein the depositor receives only a credit to withdraw not necessarily the same product tendered, but a similar quantity of the same grade and type." (Plaintiff here made no deposits and subsequent withdrawals. It put gasoline through the terminal, continuously taking out the identical gasoline put in.)

10. "The regulatory commissions of the several States have assumed jurisdiction of the carriers providing such transportation and have undertaken the exclusive regulation thereof in the same manner as other intrastate commerce within their respective boundaries." (Alabama did not assume jurisdiction here.)

11. "This Commission has likewise recognized such transportation to be intrastate and has not undertaken to assume jurisdiction thereof, nor to interfere with its regulation by the several States." (The Interstate Commerce Commission did assume jurisdiction here.)

The contrast between the findings of the Commission set out above and the facts in this case is plain. It shows that all of the factual elements that make transportation interstate were absent in Ex Parte No. MC–48 but are present here.

One of the leading cases from the Supreme Court on the issue here is Atlantic Coast Line R. Co. v. Standard Oil Co., supra. There the Supreme Court, as did the Interstate Commerce Commission in Ex Parte No. MC–48, considered the factual elements determinative of the question whether particular transportation within a single state is in interstate or intrastate commerce. In that case Standard Oil purchased petroleum products for delivery to it by water at terminals owned and operated by it at Port Tampa and Jacksonville, Florida. Title did not pass until delivery at the terminal was effected. The prices paid were the prices in effect at the time of delivery. Thereafter Standard Oil distributed the petroleum products by tank car to 123 bulk stations owned and operated by it and then in turn further distributed it to Standard's various consumers. "Very little, if any, gasoline or refined oil [was] delivered to consumers directly from the storage tanks at Port Tampa and Jacksonville." 275 U.S. at page 264, 48 S.Ct. at page 109.

The Court concluded on the basis of these facts that the transportation from the shipper's terminal in Florida to its bulk stations in Florida was in intrastate commerce. The rationale of the holding is found at page 269 of 275 U.S., at page 110 of 48 S.Ct.:

"The important controlling fact in the present controversy, and what characterizes the nature of the commerce involved, is that the plaintiff's whole plan is to arrange deliveries of all of its oil purchases on the seaboard of Florida, so that they may all be there stored for convenient distribution in the state to the 123 bulk stations and to fuel oil plants in varying quantities according to the demand of the plaintiff's customers, and thence be distributed to subordinate centers and delivery stations, and this plan is being carried out daily. There is neither necessity nor purpose to send the oil through these seaboard storage stations to interior points by immediate continuity of transportation. The seaboard storage stations are the natural places for a change from interstate and

foreign transportation to that which is intrastate and there is nothing in the history of the whole transaction which makes them otherwise, either in intent or in fact. There is nothing to indicate that the destination of the oil is arranged for or fixed in the minds of the sellers beyond the primary seaboard storages of the plaintiff company at Tampa, Port Tampa, Jacksonville, or the St. Johns river terminal. Everything that is done after the oil is deposited in the storage tanks at the Tampa destinations, or at the Jacksonville destinations is done in the distribution of the oil to serve the purposes of the plaintiff company that imported it. Neither the sellers, who deliver the oil, nor the railroad company, that aids the delivery of the oil to the storage tanks and tank cars at the seaboard, has anything to do with determining what the ultimate destination of the oil is, or has any interest in it, or any duty to discharge in respect to it, except that the railroad company, after the storage in Florida has been established for the purposes of the plaintiff company, accepts the duty of transporting it in Florida to the places designated by the plaintiff company."

The Standard Oil case, like Ex Parte No. MC–48, is sharply different than the case here. Here title to the gasoline was in plaintiff before any transportation took place and remained in plaintiff through ultimate consumption. Here plaintiff's whole plan was *not* to arrange deliveries to a water terminal so that it might be there stored for convenient distribution to bulk stations according to demand and then subsequent further distribution to particular subordinate centers and delivery stations. On the contrary, plaintiff's whole plan was to arrange through deliveries from Texas to six specific consuming points in Alabama and Mississippi. In the Standard Oil case there was "neither necessity nor purpose to send the oil through these sea-

board storage stations to interior points by immediate continuity of transportation." 275 U.S. at page 269, 48 S.Ct. at page 111. In this case that was precisely both the necessity and the purpose and was in fact done.

In the last analysis, as the Supreme Court's opinion in the Standard Oil case shows, the controlling fact is the fixed and persisting intent of the shipper at the time the initial transportation commences. The intent of the shipper is, of course, his present as distinguished from his ultimate intent. As a practical matter of business, any time a shipper moves products to a terminal his ultimate intent is that they be distributed among various consumers at various consuming points. If this is the only intention, the interstate journey ordinarily ends at the terminal. However, if, at the time he moves products to a terminal his present intention is that they merely be put through the terminal on their way to specific consumers at specific consuming points the interstate journey does not end until the products reach those consumers at those points. In this case plaintiff had the latter intent, viz.: the intent to ship its own gasoline from Texas to Craig Field, Alabama for its own consumption there. It follows that the interstate journey did not end until the gasoline in fact reached Craig Field.

The following cases are some examples of instances in which it was held that in circumstances similar to those here transportation was in interstate commerce because the shipper's specific intent at the time of shipment, like that of plaintiff here, was to move the goods beyond the terminal. Baltimore & Ohio S. W. R. Co. v. Settle, 260 U.S. 166, 43 S.Ct. 28, 67 L.Ed. 189 (Lumber shipped from South to Oakley, Ohio, where shipper took physical possession of it and then reshipped it to Madisonville, Ohio, the known destination at time of shipment. Held that the movement from Oakley to Madisonville was in interstate commerce); Southern Pacific Terminal Co.

v. Interstate Commerce Commission, 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (shipper purchased cotton seed cake in interior of Texas for export. Seed was shipped to him by rail to Galveston where it was unloaded, processed into meal and then exported by him. Held that the transportation from the interior of Texas to Galveston was not intrastate commerce); William E. Rush Common Carrier Application, 17 Motor Carrier Reports 661 (Ore shipped by truck from Idaho mine to Idaho rail station, there reloaded onto rail cars and shipped out of state. Held that truck movement was in interstate commerce because shipper's intention was that ore move out of state from rail station as rapidly and as continuously as practicable and there was in fact no prolonged delay at rail station); Dora Motor Carrier Operations Within Arizona, 48 M.C.C. 171 (Meats and packing house products shipped from Denver, Colorado to Globe, Arizona, there unloaded and reloaded onto Dora's trucks for transportation to points within 50 miles of Globe. Held that Dora was operating in interstate commerce because the consignees beyond Globe were known at the time the shipment left Denver and there was no interruption in the movement other that that required for unloading and reloading at Globe).

One further matter remains, which can be disposed of without elaborate or extended discussion. That is this. Included in the amount plaintiff seeks to recover in this suit are $27.92 alleged to be overcharges by defendants on a single movement of gasoline for plaintiff from Mobile, Alabama to Craig Field, Alabama. Plaintiff offered no evidence in support of this allegation and there is nothing in the record from which it can be determined whether this movement was in interstate or intrastate commerce or whether the rate charged by defendants for this movement was or was not proper. In these circumstances, the Court must find for defendants on this allegation because plaintiff has failed to carry its burden of proof.