NORTHWEST TERMINAL ELEVATOR ASSOCIATION, a Minnesota corporation, Bunge Corporation, a New York corporation, Burdick Grain Company, a Delaware corporation, Cargill, Inc., a Delaware corporation, Continental Grain Company, a Delaware corporation, Farmers Union GTA, a Minnesota corporation, General Mills, Inc., a Delaware corporation, International Multifoods, a Delaware corporation, Peavey Company, a Minnesota corporation, The Pillsbury Company, a Delaware corporation, and Tabor Grain Company, a Nevada corporation, d/b/a ADM Grain Co., Plaintiffs,

v.

MINNESOTA PUBLIC UTILITIES COMMISSION, and its Commissioners, Roger L. Hanson, Leo G. Adams, Terry Hoffman, Juanita R. Satterlee, Lillian W. Lazenberry, Minnesota Department of Transportation, and Richard P. Braun, its Commissioner, and the Minnesota Permit Truckers Association, a Minnesota corporation, Defendants.

Civ. No. 3–81–141.

United States District Court,
D. Minnesota,
Third Division.

March 28, 1983.

Bruce F. Thompson, Patrick J. McLaughlin, Thompson, Nielsen, Klaverkamp &

James, P.A., Minneapolis, Minn., for plaintiffs.

Gilbert S. Buffington, Sp. Asst. Atty. Gen., St. Paul, Minn., for State of Minn., defendants.

Robert E. Schmidt, Waseca, Minn., for Minnesota Permit Truckers Ass'n, amicus curiae defendant.

## MEMORANDUM ORDER

MAGNUSON, District Judge.

A hearing was held before the undersigned on December 3, 1982 on the cross motions of plaintiffs and defendants Minnesota Public Utilities Commission and its Commissioners, Roger L. Hanson, Leo G. Adams, Terry Hoffman, Juanita R. Satterlee and Lillian W. Warren-Lazenberry, and the Minnesota Department of Transportation and its Commissioner, Richard P. Braun, for summary judgment pursuant to Fed.R.Civ.P. 56 as to Counts I and II of the Amended and Supplemental Complaint.

Bruce F. Thompson, Esq. and Patrick J. McLaughlin, Esq. appeared on behalf of the plaintiffs. Gilbert S. Buffington, Special Assistant Attorney General, appeared on behalf of the State of Minnesota defendants. The Minnesota Permit Truckers Association appeared amicus curiae through its counsel, Robert E. Schmidt, Esq.

Based upon the files, the Stipulation of Facts entered into by the parties and exhibits thereto, the affidavits, briefs and oral arguments, the Court grants summary judgment to plaintiffs as to Counts I and II of the Amended and Supplemental Complaint and denies the defendants' motion for summary judgment as to these Counts.

In Count I of the Amended and Supplemental Complaint (hereinafter "Complaint"), those plaintiffs who own or operate the River Terminal Elevators identified in the stipulation seek declaratory and injunctive relief against enforcement of a Detention Order promulgated by the Minnesota Public Utilities Commission (Exhibit A to Complaint). The Detention Order in issue authorizes any motor carrier operating pursuant to permits issued by defendant Minnesota Department of Transportation to file tariffs with the Commissioner imposing upon operators of the River Terminal Elevators a grain detention charge for each hour that such motor carrier is delayed in unloading grain at a River Terminal beyond a certain "free time" as specified in the Order. The relief is sought on the grounds that the grain detention charge is an impermissible regulation of interstate commerce by the State of Minnesota by virtue of federal preemption and occupation of the field of regulation over motor carrier transportation of grain and other unprocessed agricultural commodities in interstate commerce. Article I, Section 8, Clause 3 of the Constitution of the United States; the Interstate Commerce Act, Title 49 U.S.C. § 10101, et seq.; Article VI, Clause 2 of the Constitution of the United States.

In Count II of the Complaint, those plaintiffs who own or operate Country Elevators as defined in the Stipulation seek declaratory and injunctive relief prohibiting enforcement of the Order (Exhibit B to Complaint) promulgated by the State defendants which compels all motor carriers operating pursuant to permits issued by the Minnesota Department of Transportation to file and to assess rates not less than the prescribed minimum rates for the transportation of grain by such carriers in Minnesota. Specifically, the plaintiffs seek a permanent injunction prohibiting the enforcement of minimum rates against shipments from the Country Elevators operated by plaintiffs to the River and Lake Terminal Elevators as identified in the Stipulation. The relief is sought in Count II on the same grounds set forth as to Count I.

The sole issue before the Court is whether the relevant transportation for purposes of Counts I and II constitutes a part of an interstate movement, or whether the relevant transportation constitutes intrastate commerce. (Stipulation, paragraph 14). The State defendants have admitted in their Answer that they have no right to regulate rates for the relevant

transportation if it is found to be part of interstate commerce. (Answer, paragraph 12).

Defendants have also raised the issue of whether the validity of the detention rule is ripe for adjudication since the detention provision is not obligatory. This matter was determined against the defendants by the June 25, 1981 Order of this Court denying defendants' motion to dismiss on this basis.

No subsequent developments persuade the Court that it should reconsider its ruling of June 25, 1981 in regard to this issue.

The relevant transportation for purposes of Count I is the motor carrier transportation of grain furnished by permit carriers from points located in Minnesota to the River Terminal Elevators over routes located entirely within the State of Minnesota. (Stipulation, paragraph 13).

The relevant transportation, for purposes of Count II is the motor carrier transportation of grain from those Country Elevators owned and operated by plaintiffs to the River and Lake Terminal Elevators over routes located entirely within the State of Minnesota. (Stipulation, paragraph 13).

The parties have stipulated to the characteristic circumstances in which the relevant transportation of grain is furnished by Minnesota permit carriers as follows:

(a) Where the shipping Country Elevator and the receiving Terminal Elevator are not owned by the same company, the Terminal Elevator attempts to assure delivery of grain necessary to meet its requirements by entering into contracts with Country Elevators for the delivery of grain by said Country Elevators in the future. Such contracts will call for the delivery of a specified amount of grain during a stated period of time, and for a stated price. The period in the future during which the Country Elevator must deliver the grain can be as far in advance as a year from the date of the contract, or as near as the next day. The delivery periods can range from one month to a single day. The prices offered by the Terminal Elevator to the Country Elevators for deferred delivery at the Terminal Elevator vary daily in response to the prevailing market conditions. Country Elevators also ship grain to Terminal Elevators in response to the "spot price" the Terminal Elevator will pay at the time of delivery for grain delivered "on the spot". These prices at the Terminal Elevator also vary daily with market conditions. Most of the grain shipped from Country Elevators to Terminal Elevators is shipped in fulfillment of delivery requirements set in the contracts for deferred delivery. The determination of when, during the delivery period, to ship a specific truckload of grain in the fulfillment of any contract for future delivery, or in response to any spot price, is made by the Country Elevator. The Country Elevator is responsible for the shipping itself, and for the freight charges. The shipment is made pursuant to a bill of lading indicating the Terminal Elevator as the point of destination.

(b) In those circumstances in which the Country Elevator and Terminal Elevator are owned or operated by the same company, the company owning both facilities makes the determination of when a shipment to the Terminal Elevator is initiated and pays the freight charge. The shipment is made pursuant to a bill of lading indicating the Terminal Elevator as the point of destination.

(Stipulation, paragraph 15).

The Court adopts the Stipulation of Facts in its findings. In addition, the Court finds the following material facts to be undisputed and when combined with the Stipulation to entitle the plaintiffs to summary judgment on Counts I and II.

The affidavits submitted by personnel, who have knowledge and responsibility for the transportation and marketing activities of the Terminal Elevators and Country Ele-

vators owned and operated by plaintiffs, establish that there is, as a practical, economic matter, no market in Minnesota for grain received at the Terminal Elevators. The purpose, function and ordinary business activity of the Elevators is to export all grain received to other states and/or nations. Each affidavit states that the grain is purchased by plaintiffs' terminals or shipped from plaintiffs' country elevators with the knowledge and intent of shipping the grain to other states and/or nations. The primary market for grain shipped to the terminals is New Orleans, Louisiana. The least expensive method of transporting grain to New Orleans is by water.

The data within the Stipulation support these statements. Over the past six years, the figures in the Stipulation show that the vast bulk of grain shipped to the River and Lake Terminals was in fact transported to destinations outside the State of Minnesota. In some years during this period of time, all the grain shipped from a given Terminal was in fact shipped out of State. By defendants' calculations, during the six year period of time, at most 1.5 to 1.6 percent of the grain shipped from the River and Lake Terminals was shipped to either points within Minnesota or to unknown destinations. It is also undisputed that since grain is a fungible commodity, it is not possible to determine that a specific truckload of grain will in every instance move to out of state destinations given the fraction of grain in certain years that does remain within the State. The Stipulation establishes that the price paid to the seller of grain by the Terminals is based upon its grade, necessitating the testing and grading of samples upon arrival of the grain at the Terminals. In addition, the storage of grain at the Terminals is necessary at times due to seasonal fluctuations in volume receipts and due to ice during the winter months.

During oral arguments, plaintiffs clarified that preexisting contracts for shipment out of State do exist in the usual course of business at the time the grain is shipped to the Terminal Elevators. Defendants offered no evidence to create a genuine issue as to the correctness of this representation. Mr. Schmidt, counsel for amicus curiae, did suggest that he was certain that such contracts did not exist in all situations. However, there was no evidence presented to challenge this as a course of business practice by the Terminals.

Based upon the undisputed facts, the Court finds that the relevant transportation for Counts I and II constitute the first leg of a large and constantly recurring course of interstate commerce passing out through plaintiffs' River and Lake Terminals.

From its earliest decisions, the United States Supreme Court has made clear that the resolution of whether given Transportation is interstate or intrastate is to be based upon the practical realities of the commerce involved. Thus, in the milestone decision of *Swift & Co. v. United States*, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518 (1904), the Court refused to allow local incidents of purchase, slaughter and sale, which taken alone would be intrastate activities, to characterize the great recurring interstate movement of cattle through the Chicago stockyards to the east. "[C]ommerce among the states is not a technical legal conception, but a practical one, drawn from the course of business." Id. at 398, 25 S.Ct. at 280. *See also, Chicago Board of Trade v. Olsen*, 262 U.S. 1, 43 S.Ct. 470, 67 L.Ed. 839 (1923).

Based upon this practical approach, the Courts have held consistently that the "essential character of the commerce, not its mere accidents" is the decisive test in resolving whether the transportation of goods is interstate or intrastate commerce. *Texas & N.O.R. Co. v. Sabine Tram Co.*, 227 U.S. 111, 126, 33 S.Ct. 229, 234, 57 L.Ed. 442 (1913). *See also, Baltimore & O.S.W.R. Co. v. Settle*, 260 U.S. 166, 170–171, 43 S.Ct. 28, 30–31, 67 L.Ed. 189 (1922), *United States v. Majure*, 162 F.Supp. 594, 598 (S.D.Miss.1957), *Farmers Union Cooperative Marketing Association v. State*

**26**

*Corporation Commission of Kansas,* 302 F.Supp. 778, 783 (D.Kan.1969).

In determining whether a movement of goods totally within one state is part of an interstate movement, Courts have looked to the fixed and persisting transportation intent of the shipper at the time of shipment as indicative of the essential character of the movement. *See e.g. Baltimore & O.S. W.R. Co. v. Settle,* 260 U.S. at 170–171, 43 S.Ct. at 30–31; *State Corporation Commission v. Bartlett,* 338 F.2d 495, 497–498 (10th Cir.1964); *United States v. Majure,* 162 F.Supp. at 598.

■ The burden of proof in establishing the essential character of such a movement is on the party asserting interstate transportation. *Pennsylvania R.R. v. Knight,* 192 U.S. 21, 27, 24 S.Ct. 202, 203, 48 L.Ed. 325 (1904).

Defendants contend that plaintiffs have failed to meet their burden. The thrust of defendants' argument is that the subjective, actual intent of those who send grain to the plaintiffs' terminals at the time such shipments commence is controlling. Defendants argue that plaintiffs have failed to establish this intent on either the part of the country shippers in Count I or on the part of the country elevator operators in Count II. Therefore, there can be no finding of interstate commerce as to the relevant transportation in either Count I or Count II.

Defendants contend that the following facts stipulated to in the "characteristic movement" (*See* Stipulation, paragraph 15) unquestionably make it the country shippers' intent that controls in Count I; responsibility of arranging and paying for transportation; bills of lading showing the terminals as the point of destination; and passage of title to the grain upon delivery at the terminals. As to Count II, defendants argue that because a small amount of grain remains within Minnesota, plaintiffs are not in a position to claim that an intent to ship grain in interstate commerce is "fully matured and fixed" until specific grain has actually been irrevocably committed to a journey out of state.

The Court does not find that the case law supports defendants' position that the actual, subjective intent of either the country shippers or the country elevator operators at the time of shipment is the controlling factor in determining the essential character of the relevant transportation.

In *Texas & N.O.R. v. Sabine Tram Co.,* 277 U.S. at 126, 33 S.Ct. at 234, the United States Supreme Court rejected a similar argument in its determination that an initial leg of transportation within Texas was part of an interstate movement. The Court found it of no consequence that Sabine Company, the manufacturer and seller of lumber, had no concern, connection with or knowledge of the lumber once it had been transported by Sabine Company from its mill in Ruliff, Texas to Sabine, Texas for purchase by the W.A. Powell Company. "Its [Sabine's] relation to the shipment was a perfectly natural one, and did not change the relation of the Powell Company to it, and make the lumber other than lumber purchased at Ruliff, and started from there in transportation to a foreign destination." *Id.* at 130, 33 S.Ct. at 236. The Court reiterated that it was the essential character of the commerce, not its mere accidents, that should determine. "It was to supply the demand of foreign countries that the lumber was purchased, manufactured, and shipped, and to give it a various character by the steps in its transportation would be extremely artificial." *Id.* at 126, 33 S.Ct. at 234. The interstate nature of the commerce was not defeated by the fact that the lumber was shipped by the Sabine Company f.o.b. Sabine, Texas upon a local bill of lading with Sabine ultimately paying the freight charges. *Id.* at 114–116, 33 S.Ct. at 230–231. Nor was the interstate nature of the commerce defeated by the absence of definite foreign destinations at the commencement of the shipments from Ruliff. *Id.* at 130, 33 S.Ct. at 236.

The factor in *Sabine Tram* that was controlling was the purpose of the W.A. Powell Company in purchasing the lumber and setting it in motion from Ruliff, i.e. to supply the demand of foreign countries.

As evidence in support of this intent and purpose, the Court noted: "There is not now and was not, at the time these shipments moved, any local market for lumber at Sabine...." 277 U.S. at 120, 33 S.Ct. at 232. The shipments of lumber "constitute a large and constantly recurring course of foreign commerce passing out through the port of Sabine." Id. at 122, 33 S.Ct. at 233.

The *Sabine* case makes clear that the country shippers' responsibility for arranging and paying for the transportation to plaintiffs' terminals, local bills of lading, and passage of title to the grain upon delivery at plaintiffs' terminals do not make the country shippers' subjective intent controlling in determining the essential nature of the relevant transportation for Count I. Nor is the subjective intent of the country elevator operators the relevant inquiry in determining the essential nature of the relevant transportation in Count II.

The relevant inquiry in the instant case is the purpose of the plaintiffs in purchasing grain from points within Minnesota and setting the grain in motion to their River and Lake Terminals. The Court finds that the undisputed facts demonstrate a clear intent and purpose on the part of the plaintiffs at the time the grain is purchased and shipped to their terminals that it is being done to supply the demands of other states or nations.

The plaintiffs have presented affidavits from personnel at each terminal which defendants do not dispute. Each affidavit states that the intent, purpose, function and ordinary business activity of the Terminal Elevators in purchasing grain from country shippers or from their country elevators is to ship the grain out of state.

The data contained within the exhibits to the Stipulation substantiate that over the past six years, the course of business of plaintiffs' terminals has been to export all but a small fraction of the grain received at the terminals. In given years during this period of time, all grain so received was in fact exported. (*See* for example, the statistics in: Exhibit 3 for Cargill's Elevator C in 1977; Exhibit 4 for Port Continental Eleva-

tor in 1976; Exhibit 5, Continental Elevator, Red Wing, 1976, 1980 and 1981; Exhibit 6, Farmers Union GTA, Packer River, 1976 through 1981; Exhibit 10, Peavey River Terminal, 1977 through 1981; Exhibit 11, Pillsbury's Red Rock River Terminal, 1976 and 1977; Exhibit 12, Burdick's Port ConAgra, 1979; Exhibit 13, Cargill Elevator B, 1976 through 1978).

It is not disputed that due to transportation and handling costs, the grain received at the plaintiffs' Terminal Elevators cannot compete on the basis of price with grain offered directly to local mills or processing facilities. As in *Sabine*, as a practical, economic matter, there is no local market for the grain received at plaintiffs' terminals. Grain is shipped to plaintiffs' terminals to effect a change in the mode of transportation to take advantage of the most economical method of transportation to the primary market in New Orleans. The shipments of grain in issue are clearly part of a large and recurring course of interstate commerce passing out through plaintiffs' Terminals to other states and nations.

A brief analysis of caselaw subsequent to *Sabine Tram* indicates that when the Courts look to the fixed and persisting transportation intent at the time of shipment in characterizing one portion of a journey, in essence the Courts make the same analysis made in *Sabine*. They look to the purpose in effecting the shipments as ascertained from all the facts and circumstances surrounding the shipments and the logical relation of the portion of transportation in issue to the entire journey.

In *Baltimore & O.S.W.R. Co. v. Settle, supra,* the Supreme Court held that the final leg of a shipment of lumber between points in Ohio was part of the interstate movement of that lumber from the southern United States. The shipper admitted that the intermediate stop within Ohio was not the intended destination. Rather, the admitted purpose in shipping to Oakley [the intermediate stop] and then reshipping upon a local bill of lading to the final destination in Ohio was to take advantage

of lower intrastate rates for the final leg of the shipment. The Court noted that the shipper had no place of business at Oakley, that it was not probable or expected that the shippers would find a customer at Oakley, and that the purpose in shipping to Oakley was not to find a customer there. 260 U.S. at 169, 43 S.Ct. at 30. The Court held that "[u]nder these circumstances, the intention as it was carried out determined, as a matter of law, the essential nature of the movement." Id. at 171, 43 S.Ct. at 30.

The transportation contract entered into between the shipper and carrier at the point of origin was without legal significance in determining the character of the movement in light of the admission that the actual destination had at all times been intended. Id. at 171, 43 S.Ct. at 30.

In *State Corporation Commission v. Bartlett, supra,* under circumstances similar to the instant case, the Court held that shipments of grain purchased at Bartlett's country elevators or other interior points in Kansas and shipped to Bartlett's River Terminal in Kansas were interstate in nature. The grain was transported by independent truckers to the River Terminal where it was graded, tested and deposited in bins for eventual reshipment by river rail to out-of-state buyers.

No truckload was obtained to fill particular existing contracts out of state, but all grain so purchased was in fact shipped to out-of-state purchasers. The Court found that "from the time of purchase and shipment to River Rail until the time it was sent to out of state buyers, the activities in connection with the grain were performed in furtherance of a clear intent that it ultimately be delivered to a buyer outside of Kansas. The shipment to River Rail was but the commencement of this movement." 338 F.2d at 498.

In *United States v. Majure, supra,* relied on by defendants, the Court held that the final leg of transportation between a port in Alabama and six airfields within the state was part of the interstate movement of the gas from Texas. The Court stated that the "whole plan was to arrange through deliveries to six specific consuming points...." 162 F.Supp. at 601. This was the shippers present intent at the time the shipments of gas commenced from Texas and was deemed controlling. Id. at 601. The Court in *Majure* contrasted this situation from those in which goods are sent to terminals without necessity or purpose of further shipping, but simply to await convenient distribution according to the demands of local buyers. In dicta, the Court stated that in the latter situation, the interstate journey ordinarily ends at the terminal. Id. at 601. As applied to the instant case, the Court finds that the undisputed facts show that there is both necessity and purpose in shipping the grain in a continual flow out from the plaintiffs' terminals to other states or nations and that this purpose exists when the grain is purchased and caused to be shipped to plaintiffs' terminals. As in the *Settle* case, relied on by the Court in *Majure,* local consumption of the grain from plaintiffs' terminals is neither probable nor expected, and the purpose in shipping grain to the plaintiffs' terminals is not to find local customers. 162 F.Supp. at 601. The statistics set forth in the stipulation amply demonstrate this.

Defendants would distinguish the *Sabine Tram* and *Bartlett* cases from the instant case on the basis that in *Sabine* and *Bartlett* all of the lumber or grain purchased was in fact shipped overseas or outstate. In *Sabine Tram,* there was only a reloading at another company's facilities. It was virtually impossible for Powell not to export all the lumber it purchased and shipped to Sabine since the town of Sabine was nothing but a place to load ships. Defendants argue that in such cases, the concept of "intent" is absorbed into the clearly interstate movement in a way that cannot occur when all the goods shipped do not go out of state as in the instant case.

In a situation when all goods do not move out of state in all years, the defendants contend that the cases of *Southern Pacific Transportation Company v. I.C.C.,* 565 F.2d 615 (9th Cir.1977) and *Western Grain Exchange, Inc., et al. v.*

*Burlington Northern, Inc.,* I.C.C. Docket No. 37373, June 18, 1981, currently on appeal to the U.S. District Court in Montana, support a finding of intrastate commerce in the instant case. It is not entirely clear whether defendants rely upon these cases for both the proposition that it is the subjective, actual intent of the country shippers in Count I and country elevator operators in Count II that is controlling in determining the essential nature of commerce or only that the fixed and persisting intent of the initial shipper, be it deemed the country shipper, the country elevator operators or the terminal elevators, cannot be established given the fraction of grain which remains in Minnesota in given years. Defendants acknowledge that the Packer River Terminal exported all of its grain in each of the six years of activity demonstrated in the Stipulation. (*See* Exhibit 6). Therefore, defendants presumably concede that the case law they rely upon is not supportive of dealing with this particular Terminal or the essential nature of the commerce relevant to it.

First of all the Court would note that the fact that the lumber was only reloaded in Sabine, Texas without further processing in the *Sabine Tram* case is not in and of itself a critical distinction as opposed to the activities that take place at plaintiffs' terminals. The *Bartlett* case makes clear that the mere fact that grain ultimately destined for shipment to another state undergoes temporary storage, inspection, weighing, grading or mixing and change of ownership or destination in the state of origin does not take it out of interstate commerce. *State Corporation Commission v. Bartlett & Company,* 338 F.2d 495, 498 (10th Cir.1964) *cert. den.* 380 U.S. 964, 85 S.Ct. 1109, 14 L.Ed.2d 154 (1965) citing to *Chicago Board of Trade v. Olsen,* 262 U.S. 1, 43 S.Ct. 470, 67 L.Ed. 839 (1923).

Secondly, the *Southern Pacific* and *Western Grain* cases are not supportive of the argument that the subjective, actual intent of the country shippers or country elevator operators at the time shipment commences is controlling in those cases in which all of the grain so shipped does not

necessarily move to out of state destinations after the initial leg of transport.

In *Southern Pacific,* the Court looked to the intent of DelMonte at the time shipments commenced to determine the essential nature of the transportation between its canning facilities in San Jose and Emeryville, California and its warehouse in Stockton, California. 565 F.2d at 617–618. DelMonte was owner and operator of all the facilities involved. Therefore, *Southern Pacific* does not support the position that the actual, subjective intent of the country shippers or country elevator operators is controlling in the instant case. In *Western Grain,* the Commission looked to the intent of the parties who were engaged in buying and selling grain purchased from producers and country elevators in Montana and transported to their terminals in Great Falls, Montana. I.C.C. Docket No. 37373 at 4. The Commission never mentions the intent of the country producers or country elevator operators.

None of the cases cited by defendants dictate that the relevant inquiry in the instant case in determining the essential nature of the transportation in issue is limited to that of the actual, subjective intent of the country shippers in Count I or the country elevator operators in Count II.

██ This leaves the issue of whether the fact that not all grain in all years is shipped out of state by all plaintiffs precludes a finding of interstate commerce. In arguing that it does, defendants rely heavily upon the *Southern Pacific Transportation v. I.C.C., supra, Western Grain Exchange, Inc., et al. v. Burlington Northern, Inc., supra,* and *Dallum v. Farmers Cooperative Trucking Association,* 49 F.Supp. 785 (D.Minn.1942). In arguing that it does not, the plaintiffs rely in particular upon *Lemke v. Farmers' Grain Elevator,* 258 U.S. 50, 42 S.Ct. 244, 66 L.Ed. 458 (1922); *Railroad Commission v. Worthington,* 225 U.S. 101, 32 S.Ct. 653, 56 L.Ed. 1004 (1912); and *Farmers Union Cooperative Marketing Association v.*

*State Corporation Commission of Kansas,* 302 F.Supp. 778 (D.Kan.1969).

In *Southern Pacific Transportation Company v. I.C.C., supra,* the Ninth Circuit set aside an I.C.C. decision which had held that the transportation of canned goods from DelMonte's plants in San Jose and Emeryville, California to its warehouse in Stockton, California were interstate in character due to the intent manifested by notations on most bills of lading which rendered the goods eligible for transit privileges. It was undisputed that under the options available in the transit tariffs relied upon by the Commissioner to establish intent to ship interstate, that DelMonte need not and did not decide whether the goods would move intrastate, interstate or foreign until after the goods came to rest at its Stockton warehouse. 565 F.2d at 618.

The only other evidence before the Commission and before the Ninth Circuit was the general knowledge that nearly all of the canned goods shipped to Stockton eventually moved to interstate and foreign destinations. The Court found this "expectation" insufficient to establish the fixed and persisting intent of DelMonte at the time of shipment from its canning plants to move the goods in interstate commerce. 565 F.2d at 618. It should be noted that DelMonte was not a party to this action. There was no testimony from its personnel as to the purpose or intent in shipping the canned goods nor any other evidence by way of data as to the actual business practices of DelMonte. There was no evidence, as in the instant case, and as in *Sabine Tram* that as a practical, economic matter no local market in California existed for the canned goods shipped to Stockton. Despite rather broad dicta, the holding in *Southern Pacific* rests upon the fact that the eligibility of goods for transit privileges was insufficient evidence to establish that the essential character of the commerce in question was interstate. *Id.* at 621.

It is also worth noting that the Court in *Southern Pacific,* while recognizing that state taxation of goods involved some different considerations, found among others, the tax case of *Federal Compress Co. v. McLean,* 291 U.S. 17, 54 S.Ct. 267, 78 L.Ed. 622 (1934) helpful to it in determining constitutional limits of interstate commerce. 565 F.2d at 620. In *Federal Compress,* the U.S. Supreme Court upheld the local taxation of cotton stored in warehouses whose movement out of the warehouse to points out of state depended upon the will of various holders of warehouse receipts. "It is clear by all accepted tests the cotton, while in appellant's warehouse, has not begun to move in interstate commerce." *Southern Pacific,* 565 F.2d at 620 quoting *Federal Compress Co. v. McLean,* 291 U.S. at 21, 54 S.Ct. at 268. The tax stood notwithstanding the fact that all but a negligible part of the cotton was ultimately shipped to points out of state. The tax burden on the warehoused cotton was too indirect and remote to transgress constitutional limitations. 291 U.S. at 22, 54 S.Ct. at 269. In so holding, the Supreme Court stated that *Federal Compress* stood on a footing different from those cases in which local regulations of the business of purchasing a commodity within and shipping it without the state have been deemed to impede or embarrass interstate commerce in those commodities, citing to *Lemke v. Farmers' Grain Co.,* 258 U.S. 50, 42 S.Ct. 244, 66 L.Ed. 458 (1922), 291 U.S. at 22, 54 S.Ct. at 269. In *Lemke* the interstate nature of commerce was not defeated by the possibility that not all grain purchased in all instances would leave the State of North Dakota given the overall purpose and course of business established by the evidence.

In *Western Grain Exchange,* the Commission held that the transportation of grain from points within Montana to Great Falls, Montana for eventual shipment of almost all grain outstate was in intrastate commerce. The transportation found to be intrastate in *Western Grain* is similar to the relevant transportation in issue in this case. However, there are a number of critical differences in the proof leading to the Commission's determination. The position of the shippers (those engaged in buying and selling grain purchased from pro-

ducers and country elevators) was that the transportation was intrastate. It was incumbent upon Burlington Northern, the carrier and proponent of interstate commerce, to establish that the purpose and intent of the shippers was to ship the grain in interstate commerce. Each shipper testified that they did not know for certain the ultimate disposition of grain until after it was inspected and processed. No. 37373 at 8. The shippers were asked to provide records which would establish the true character of the subject shipments. Two of the shippers refused to furnish the records and the other shipper provided only certain minimal records. The Commission noted that most important to its decision was that the grain came into the unrestrained possession of each shipper at each shipper's privately owned facilities and not on the rail carrier's tracks. No other obligations were shown to have curtailed the individual shippers' freedom to act. No. 37373 at 14. The Commission held:

Ultimately, our decision rests on the fact that Burlington has failed to carry its burden of proving that the subject shipments are interstate in nature. In reaching this conclusion, we note that the Burlington failed to follow diligently avenues which might have produced more conclusive evidence than exists on this record as to the original intent of each shipper. Specifically, little effort was made to obtain shippers' records which were available under shippers' contracts with the Bureau beyond perfunctory requests. Weighing in balance all of the considerations outlined, we believe that all the subject movements to Great Falls are intrastate in nature subject to intrastate rates. No. 37373 at 14.

The plaintiffs in this case have not simply relied upon ambiguous transit notations or general knowledge of their shipping practices to meet their burden of establishing the interstate nature of the relevant transportation. In addition to the data contained in the exhibits to the stipulation which set forth in detail the actual grain movements for each plaintiff over each of the past six years, knowledgeable personnel have submitted affidavits as to the purpose and intent in having the grain shipped to the terminals and as to the ordinary business practices of the plaintiffs' facilities. In general, preexisting contracts exist for sales of the grain at the time the grain is shipped to the various terminals. As a practical, economic matter no local market exists in Minnesota for grain shipped to plaintiffs' terminals. As a practical matter, the least expensive method for shipping to plaintiffs' primary market is by water.

Nor is the Court persuaded that *Dallum v. Farmers Cooperative Trucking Association*, 49 F.Supp. 785 (D.Minn.1942) relied upon by defendants, requires a finding that the relevant transportation in the instant case is intrastate in character. *Dallum* involved the question of whether shipments of dairy products from rural creameries in Minnesota to depots in Minneapolis, St. Paul and Duluth constituted the first leg of interstate commerce, for purposes of determining the application of the Fair Labor Standards Act to defendant's drivers. Five specific hauls were in issue. In four of the hauls, the creameries supplied the defendant's truck drivers with shipping directions which indicated that the transportation of the goods would be continued beyond state lines after delivery to depots in Minneapolis, St. Paul and Duluth. The Court found these hauls to be interstate in character as evidenced by the shipping directions issued in connection with these movements. 49 F.Supp. at 788.

The fifth haul, which involved transportation of butter from the rural creameries to the National Butter Company, was evaluated in terms of shipments occurring before and after February 1, 1940. No through shipping arrangements or provisions existed for the shipment of the butter beyond state lines in either of these time periods. The Court in *Dallum* relied upon the *Sabine Tram* case in holding that the shipments of butter occurring prior to February 1, 1940 were interstate in character regardless of the lack of through shipping directions. 49 F.Supp. at 789. The Court

found it obvious that the railroad yards or terminals in St. Paul or Minneapolis were not the intended destination of the butter. The haul from the creameries to St. Paul or Minneapolis was but the first step in the haul to Dubuque, Iowa. *Id.* at 789.

After February 1, 1940, the National Butter Company established a distributing plant in St. Paul where the butter was graded, cut, made into prints and prepared for reshipment. The Court found that the National Butter Company apparently planned and intended to store the butter at the St. Paul plant until delivery was demanded by its customers. "No further movement of any particular part to any particular person was contemplated." 49 F.Supp. at 789. Based upon these findings, the Court held that the transportation of butter from the rural creameries to the St. Paul distributing plant of the National Butter Company were intrastate movements. *Id.* at 790. The facts do not reveal that there was as a practical matter no local market for the cut butter stored in St. Paul.

Defendants argue that plaintiffs' shipments of grain to their terminals are comparable to the post February 1, 1940 shipments in *Dallum* which the Court found to be intrastate shipments. However, the Court finds that the pre-February 1, 1940 shipments compare more favorably to plaintiffs' shipments. As the Court in *Dallum* found it obvious that the intended destination of the bulk butter was not the railroad yards or terminals in St. Paul or Minneapolis, the Court finds it obvious that the intended destination of the bulk grain is not plaintiffs' Lake or River Terminals.

The case of *Lemke v. Farmers' Grain Elevator*, 258 U.S. 50, 42 S.Ct. 244, 66 L.Ed. 458 (1922) involved circumstances quite similar to the case before the Court. In *Lemke*, the United States Supreme Court affirmed the Eighth Circuit which had declared the North Dakota Grain Grading and Inspection Act void as an unlawful regulation of interstate commerce. The challenged Act attempted to regulate the purchase of grain from local markets in North Dakota by grain elevators located in North Dakota by requiring state licenses for all such purchasers and by prescribing a system of grading, inspecting and weighing with power residing in the State's Grain Inspector to determine the margin of profit. 258 U.S. at 56–57, 42 S.Ct. at 246–247. The Court looked to the course of business of the purchasers in determining that the transactions of purchase which the State was attempting to regulate were in interstate commerce. "There is practically no market in North Dakota for the grain purchased.... The purchases are generally made with the intention of shipping the grain to Minneapolis." 258 U.S. at 54–55, 42 S.Ct. at 246. The Court in *Lemke* did not find dispositive the fact that after purchase some of the grain might have been diverted to local markets.

> It is true, as appellants contend, that after the wheat was delivered at complainant's elevator, or loaded on the cars for shipment, *it might have been diverted to a local market or sent to a local mill. But such was not the course of business.* The testimony shows that *practically all the wheat purchased by the complainant was for shipment to and sale in the Minneapolis market. That was the course of business, and fixed and determined the interstate character of the transactions.* Swift & Co. v. United States, 196 U.S. 375, 25 Sup.Ct. 276, 49 L.Ed. 518; *Eureka Pipe Line Co. v. Hallanan*, decided by this court December 12, 1921, 257 U.S. 265, 42 Sup.Ct. 101, 66 L.Ed. 227, and *United Fuel Gas Co. v. Hallanan*, decided the same day, 257 U.S. 277, 42 Sup.Ct. 105, 66 L.Ed. 234.

258 U.S. at 55, 42 S.Ct. at 246. (Emphasis added)

It is difficult to find any appreciable difference between the relevant facts in *Lemke* and those in the instant case. Defendants attempt to distinguish the *Lemke* holding on the basis that the Court in *Lemke* did not address the transportation from the local markets in North Dakota to the grain elevators. It is true that that

was not an issue before the Court in *Lemke.* What the Court in *Lemke* did find to be interstate transactions were the purchases of grain by the elevators from local sellers, transactions which took place wholly within the State of North Dakota. The purchases within North Dakota in this respect parallel the relevant transportation in the instant case.

In addition, the Court in *Lemke* looked to the intent and purpose of the elevator operators at the time the purchases were made which parallels the intent and purpose of the terminal elevators at the time shipment commences in the instant case. As in *Lemke,* the evidence before this Court establishes that *practically all* the grain purchased is intended for shipment outstate. As in *Lemke,* there is practically no local market for the grain purchased and shipped to plaintiffs' terminals. As in *Lemke,* the grain shipped to plaintiffs' terminals might be diverted to a local market or sent to a local mill, but such is not the course of business.

Defendants have also urged the Court to distinguish *Lemke* on the basis that the type of regulation sought to be imposed by the State of North Dakota differs from the State regulations in the instant case. However, the issue of whether the regulations sought to be enjoined by plaintiffs are an impermissible regulation of interstate commerce is not before the Court. The defendants have admitted this to be the case if the relevant transportation is interstate commerce. (Answer, paragraph 12). In *Lemke,* the Court first addressed the facts of the case to determine if the transactions of purchase were in interstate commerce. Only after determining that they were did it become relevant to look at the regulatory activity of the State of North Dakota to determine if it were an impermissible regulation of interstate commerce. The only portion of the *Lemke* holding relevant to the issue before this Court is the determination and analysis regarding the nature of the commerce in issue.

Similarly, in *Railroad Commission v. Worthington,* 225 U.S. 101, 32 S.Ct. 653, 56 L.Ed. 1004 (1912), in determining that an interstate rate applied to coal loaded in Ohio onto vessels for shipment on Lake Erie, the Supreme Court held that the substance of things was not changed by the fact that a small part of the coal might be unloaded at one of the Ohio Islands in Lake Erie. Id. at 108, 32 S.Ct. at 655.

Plaintiffs have also cited the more recent federal decision of *Farmers Union Cooperative Marketing Association v. State Corporation Commission of Kansas,* 302 F.Supp. 778 (D.Kan.1969) in support of the position that the fact a small percent of outbound shipments from plaintiffs' terminals do not move outstate should not defeat the essential interstate nature of the relevant transportation in this case. In *Farmers Union,* the Court was confronted with the issue of whether grain shipped from country elevators within Kansas to terminals in Kansas City constituted interstate or intrastate commerce. No preexisting contracts for sale to parties outside the State of Kansas existed at the time the shipments of grain commenced from the country elevators. Once at the terminals in Kansas City, all grain shipped by barge moved outstate and all grain shipped by railroad of necessity had to pass through Missouri whether destined for outstate buyers or buyers within Kansas. Sales to Kansas buyers constituted approximately two percent of the grain shipments from the Kansas terminals. The Court held that the shipments in issue were in interstate commerce. Id. at 784.

The *Farmers Union* case is not entirely apposite in that even the small percent of the grain destined for local buyers in Kansas had to pass through Missouri of necessity. However, the Court is not persuaded that this factual difference supports a finding of intrastate commerce in the instant case. It would indeed be an anomaly if the nature of the commerce in these factually similar settings were regarded as fundamentally different simply because the two percent of the grain sales made to Kansas buyers in *Farmers Union* incidentally had to pass a few miles within the State of

Missouri before moving back into Kansas. It makes no sense that the ability to regulate interstate transportation of goods should rest upon such precarious distinctions. To so hold would defy the previously quoted principle set forth in *Swift & Co. v. United States, supra,* that "commerce among the states is not a technical legal conception, but a practical one, drawn from the course of business." 196 U.S. at 398, 25 S.Ct. at 280.

The State defendants do not dispute that they have no authority to regulate rates for interstate commerce. This accords with the Constitutional policy stated at an early date by the United States Supreme Court in *Shafer v. Farmers Grain Co.,* 268 U.S. 189, 45 S.Ct. 481, 69 L.Ed. 909 (1925):

"The right to buy [grain] for shipment, and to ship it, in interstate commerce is not a privilege derived from state laws, and which they may fetter with conditions, but is a common right, the regulation of which is committed to Congress and denied to the states by the Commerce Clause of the Constitution." Id. at 199, 45 S.Ct. at 485.

Based upon the foregoing findings of fact and conclusions of law,

IT IS HEREBY ORDERED that summary judgment is granted to the plaintiffs as to Counts I and II of the Amended and Supplemental Complaint.

IT IS FURTHER ORDERED:

(1) That Minnesota Public Utilities Commission, and its Commissioners, Roger L. Hanson, Leo G. Adams, Terry Hoffman, Juanita R. Satterlee, Lillian W. Lazenberry, Minnesota Department of Transportation, and Richard P. Braun, its Commissioner are permanently enjoined from any action or proceeding seeking to enforce the Detention Order set forth in Exhibit A to the Amended and Supplemental Complaint insofar as such enforcement affects the business of the plaintiffs in operating river terminal elevators as described in said Complaint; and

(2) That Minnesota Public Utilities Commission, and its Commissioners, Roger L. Hanson, Leo G. Adams, Terry Hoffman, Juanita R. Satterlee, Lillian W. Lazenberry, Minnesota Department of Transportation, and Richard P. Braun, its Commissioner, are permanently enjoined from any action or proceeding seeking to enforce minimum rates in connection with the transportation of grain from plaintiffs' Country Elevators, identified in the Stipulation, to plaintiffs' Lake and River Terminals, as described in the Amended Supplemental Complaint.