STATE of Minnesota, Respondent,

v.

Bob ROBERTS, d.b.a. Bob Roberts Trucking, Petitioner.

No. C2–82–1610.

Supreme Court of Minnesota.

Feb. 24, 1984.

James H. Turk, Mankato, for petitioner.

Jan Craig Nelson, Redwood County Atty., Redwood Falls, Hubert H. Humphrey, III, Atty. Gen., Gilbert S. Buffington, Sp. Asst. Atty. Gen., St. Paul, for respondent.

PETERSON, Justice.

Appellant, Bob Roberts, d.b.a. Bob Roberts Trucking, was found guilty of four counts of violating Minn.Stat. § 221.021 (1980), operating a motor carrier in commerce without the required permit. The trial court found that Roberts hauled grain in intrastate commerce without an intrastate permit and that he thereby violated section 221.021. Roberts appealed the trial court's decision to a three-judge appellate panel of the district court, which, in a split decision, affirmed. We reverse.

Bob Roberts, owner of an independent trucking business in Sleepy Eye, Minnesota, operated eleven trucks in Minnesota in 1981. All of the trucks were used exclusively to haul grain. Roberts was properly registered by the Interstate Commerce Commission to haul agricultural commodities in interstate commerce. In accord with Minn.Stat. § 221.62 (1980), Roberts had registered his exempt status with the Commissioner of Transportation. In 1981, however, Roberts did not possess the state permit necessary to haul goods in intrastate commerce as required by Minn.Stat. § 221.021 (1980).

In May 1981, Roberts hauled four truckloads of grain from the Revere Elevator (Revere Elevator) to Port Bunge, the Bunge Corporation's river barge terminal (river terminal) located on the Minnesota River at Savage, Minnesota. The shipper in each instance was Revere Elevator and/or Benson-Quinn Company, the latter a grain brokerage firm on the Minneapolis Grain Exchange. The four truckloads of corn hauled by Roberts constituted a portion of a large sale of corn by Benson-Quinn to Bunge to fulfill a previous contractual obligation of Bunge for the sale of corn to the New Orleans export market or to ports on the Tennessee River in Alabama. Between 95–100% of the grain shipped by Roberts was transported to New Orleans and was subsequently shipped to foreign markets.

The grain delivered to the river terminal by Roberts was unloaded directly into a bin for temporary storage before shipment to Alabama or Louisiana. All of the grain delivered by Roberts in May 1981 was shipped prior to June 30, 1981, most likely within hours or days of its receipt at the river terminal.

On May 13, 1981, Roberts was charged with four separate violations of section 221.021, and each violation constituted a separate misdemeanor offense under Minn. Stat. § 221.291, subd. 1 (1980). Section 221.021 forbids the hauling of grain by truck without the requisite permit issued

by the Minnesota Public Utilities Commission for current operation of the truck.[1] It is uncontested that in May 1981 Roberts did not have the state permit required by section 221.021 to haul goods in intrastate commerce. Roberts contends, however, that the shipments of grain were the first leg of an interstate operation and that because he had an interstate permit, he did not violate section 221.021.

The sole issue for decision is whether Roberts' hauling of grain from Revere Elevator to the river terminal at Savage, Minnesota, was interstate or intrastate commerce.

■ The question whether commerce is interstate or intrastate must be determined by the "essential character of the commerce," not by mere bills of lading [2] or forms of contract. *See Atlantic Coast Line R.R. v. Standard Oil Co.*, 275 U.S. 257, 268, 48 S.Ct. 107, 110, 72 L.Ed. 270 (1927). "It is well established that goods ultimately destined for shipment to another state acquire the character of interstate commerce as soon as they begin their journey, even though there is a temporary break in transit in the state of origin." *State Corp. Comm'n v. Bartlett & Co., Grain*, 338 F.2d 495, 497 (10th Cir.1964) (citing *Texas & N.O.R.R. v. Sabine Tram Co.*, 227 U.S. 111, 33 S.Ct. 229, 57 L.Ed. 442 (1913), and *Chicago Bd. of Trade v. Olsen*, 262 U.S. 1, 43 S.Ct. 470, 67 L.Ed. 839 (1923)), *cert. denied*, 380 U.S. 964, 85 S.Ct. 1109, 14 L.Ed.2d 154 (1965). The character of a shipment is determined from evidential circumstances surrounding the movement. *See Hughes Bros. Timber Co. v. Minnesota*, 272 U.S. 469, 475–76, 47 S.Ct. 170, 172,

71 L.Ed. 359 (1926). The facts of each case must be evaluated to determine the essential nature of the contested shipments and whether they are intrastate. *See Burlington Northern, Inc. v. Department of Public Serv.*, 308 Minn. 43, 47, 240 N.W.2d 554, 556 (1976).

In *Texas & N.O.R.R. v. Sabine Tram Co.*, 227 U.S. 111, 33 S.Ct. 229, 57 L.Ed. 442 (1913), under circumstances similar to the instant case, the United States Supreme Court held that shipments of lumber on local bills of lading from one point in Texas to another point in Texas and ultimately destined for export to foreign markets were interstate commerce. The Court rejected the notion that the character of the bills of lading with their in-state destinations should be the controlling factor in determining whether the lumber was being transported in interstate commerce. *Id.* at 124, 33 S.Ct. at 233. Instead, the Court reiterated that it was "the essential character of the commerce, not its mere accidents, that should determine." *Id.* at 126, 33 S.Ct. at 234. The Court stated that the "continuity of movement" of the goods to an out-of-state market and the "nature of the traffic" determines the goods' character. *Id.* at 124, 126, 33 S.Ct. at 233, 234. Because there was no delay for manufacturing or processing of the lumber once it was delivered to its in-state destination, rather the delay was an incident to transporting from rail carriage to water carriage, the detainment of the lumber in state was "but a step in its transportation to its real and ultimate destination in foreign countries." *Id.* at 126, 33 S.Ct. at 234.

In the instant case, the grain delivered by Roberts was temporarily stored in bins

---

**1.** Minn.Stat. § 221.021 (1980) provides, in part: "No person shall operate as a motor carrier without a certificate or permit in full force and effect with respect to such operation."

**2.** The state contends that because the bills of lading in the instant case show points of destination within Minnesota, the grain being hauled to the river terminal was in intrastate commerce. However, the United States Supreme Court has on numerous occasions rejected this argument as determinative of the "essential character of the movement." *See e.g., Baltimore*

*& O.S.W.R.R. v. Settle*, 260 U.S. 166, 170–71, 43 S.Ct. 28, 30–31, 67 L.Ed. 189 (1922); *Texas & N.O.R.R. v. Sabine Tram Co.*, 227 U.S. 111, 124–25, 129, 33 S.Ct. 229, 233–34, 235, 57 L.Ed. 442 (1913); *Ohio R.R. Comm'n v. Worthington*, 225 U.S. 101, 110, 32 S.Ct. 653, 656–57, 56 L.Ed. 1004 (1912); *Southern Pac. Terminal Co. v. I.C.C.*, 219 U.S. 498, 526–27, 31 S.Ct. 279, 287–88, 55 L.Ed. 310 (1911). *See also* Tarnay, *Methods for Differentiating Interstate Transportation from Intrastate Transportation*, 6 Geo.Wash.L.Rev. 553, 569 (1938).

at the river terminal. As in *Sabine Tram,* the commodity was not processed or manufactured after it was delivered to its in-state destination. Moreover, the grain was shipped to out-of-state destinations within 1 month of Roberts' delivery.

The controlling factor in *Sabine Tram* was the purpose of the final shipper, W.A. Powell Company, in purchasing the lumber and setting it in motion from its place of origin (*i.e.*, the mill in Ruliff, Texas) to its final destination in foreign markets. The Court noted that the shipments of lumber constituted "a large and constantly recurring course of foreign commerce passing out through the port of Sabine." *Id.* at 122, 33 S.Ct. at 233. Similarly, in the instant case, all of the grain delivered by Roberts to the river terminal in May 1981 was subsequently shipped out of state to either Alabama or Louisiana.

The state's main contention is that the subjective intent of the initial shipper should be used to determine the "essential character of the commerce." However, the Court in *Sabine Tram* rejected a similar argument and noted that it was of no consequence that the original shipper, Sabine Company, had no concern, connection with, *or knowledge of the lumber* once it had been delivered to Sabine, Texas, for final shipment by W.A. Powell Company to foreign markets. *See id.* at 126, 33 S.Ct. at 234. "The determining circumstance is that the shipment of the lumber to Sabine was but a step in its transportation to its real and ultimate destination in foreign countries." *Id.*

The United States District Court for the District of Minnesota, on facts virtually identical to those in this case, reached the same conclusion, including a rejection of the "subjective intent of the original shipper" argument. *See Northwest Terminal Elevator Assoc. v. Minnesota Pub. Util. Comm'n,* 576 F.Supp. 22 (D.Minn.1983), *aff'd,* 725 F.2d 80 (8th Cir.1984). The district court held that grain was being transported in interstate commerce when it was hauled from country elevators to river terminals in Minnesota with the majority of grain being subsequently shipped out of state by barge. In *Northwest Terminal* over 98% of the grain was shipped out of state after its storage at the river terminal; in this case 100% of the grain was shipped out of state. The Eighth Circuit Court of Appeals, in its affirming opinion, noted:

> [T]he district court in a thorough opinion concluded that the truck shipments of grain from the country elevators to the terminals "constitute the first leg of a large and constantly recurring course of interstate commerce," * * *. The court rejected the contention of the Minnesota commission that the truck shipments were intrastate commerce because the initial shipper—the country elevator—intended no destination other than the terminal elevator located in Minnesota.

725 F.2d at 81.

■ The relevant inquiry in this case is the "essential character of the commerce" and the intent of all the parties formed at the time of the initial movement. The intent element is to be gleaned from all the surrounding facts and testimony and not solely from the subjective intent of the original shipper. The grain delivered to the river terminal was part of a large contract between the grain broker, Benson-Quinn (shipper), and Bunge (purchaser/shipper). Since all of the grain purchased by Bunge and delivered to Port Bunge in 1981 was shipped out of state, including all the grain delivered by Roberts, and because none of the grain in question was able to be distributed to in-state markets once Roberts began to haul the grain, the "intent" of the purchaser/shipper is an appropriate factor to be considered.

■ In this case, as in *Sabine Tram* and *Northwest Terminal,* the facts demonstrate a clear intent and purpose to purchase and ship grain to the river terminal to supply the demands of other states or foreign markets.[3] It is of no consequence

---

**3.** Two other cases, under circumstances similar    to the instant case, hold that the shipment of

that the initial shipper, Roberts or Revere Elevator, had no concern, connection with, or knowledge of the grain once it was delivered to the river terminal for shipment to foreign markets. *See Sabine Tram*, 227 U.S. at 126, 33 S.Ct. at 234. The grain was purchased and shipped to supply the demand of foreign markets, and "to give it a various character by the steps in its transportation would be extremely artificial." *Id.* Because Roberts' hauling of grain from Revere Elevator to the river terminal in Savage, Minnesota, was an initial leg of interstate movement and Roberts was properly licensed to haul in interstate commerce, we hold that Roberts did not violate Minn.Stat. § 221.021 (1980).

Reversed.

grain from country elevators to river terminals for subsequent shipment to out-of-state destinations may still be interstate commerce. *See State Corp. Comm'n v. Bartlett & Co., Grain*, 338 F.2d 495 (10th Cir.1964), *cert. denied*, 380 U.S. 964, 85 S.Ct. 1109, 14 L.Ed.2d 154 (1965); *Farmers Union Coop. Mktg. Assoc. v. State Corp. Comm'n*, 302 F.Supp. 778 (D.Kan.1969).