United States Court of Appeals
**FOR THE EIGHTH CIRCUIT**

_____

No. 97-1710

_____

| | | |
|---|---|---|
| Century Indemnity Co., a<br>Connecticut corporation, | * | |
| | * | |
| | * | |
| Appellee, | * | Appeal from the United States |
| | * | District Court for the District |
| v. | * | of Minnesota. |
| | * | |
| Linda Michelle Carlson, | * | |
| individually, and as trustee for the | * | |
| heirs of Donley Allen Carlson, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: November 21, 1997
Filed: January 7, 1998

_____

Before LOKEN, HEANEY, and BRIGHT, Circuit Judges.

_____

BRIGHT, Circuit Judge.

This action for declaratory judgment on an insurance policy has its genesis in an automobile/tractor and trailer accident which occurred in Minnesota on October 31, 1994. At that time, a tractor and trailer owned by J&T Transport, Inc. ("J&T"), a

Minnesota corporation, collided with an automobile driven by Donley Allen Carlson. The accident killed Carlson. Carlson's widow, Linda Michelle Carlson, brought a wrongful death case in the State of Minnesota seeking damages against J&T, John Schimelpfenig (the CEO and sole shareholder of J&T), and Gerald Troy Schubert (the driver of the J&T tractor/trailer).

Century Indemnity Co. ("Century"), a Connecticut corporation, which Carlson contends carried liability coverage for the J&T vehicle at the time of the accident, brought an action for declaratory judgment against Carlson, J&T, and Schubert. The parties, including Century, entered into a conditional settlement agreement in the underlying state court wrongful death action in which a stipulated judgment was entered in the amount of $1,200,000, of which $900,000 could be collected, if at all, only from Century.

Century contends that its policy did not provide insurance for the accident because the tractor and trailer at the time was engaged in intrastate commerce, rather than interstate commerce, the latter serving as a basis for coverage. Carlson counterclaimed asserting that the Century policy covered the accident and asserted a claim under the policy for the unpaid balance of the settlement, $900,000 together with interest.

The district court ruled in favor of the insurer Century, finding no insurance coverage on the ground that the tractor and trailer at the time of the accident carried grain on a trip in intrastate rather than interstate commerce. Thus, the Century coverage endorsement, which was limited exclusively to interstate commerce, did not apply.

Carlson brings this appeal. We reverse, determining that the facts and circumstances, without dispute, demonstrate that the tractor and trailer carried grain in interstate commerce and that the coverage applied.

-2-

## I. FACTUAL BACKGROUND

In essence, we reiterate the undisputed factual background as set forth in the district court's opinion. In the fall of 1994, Randy Kuenzel, a dairy farmer, grew corn on about 200 tillable acres near Cologne, Minnesota to use as feed for his livestock. In most years, Kuenzel produced more corn than he needed for his cows and more than he could store. In the years Kuenzel produced a surplus, he hired a trucking company to deliver his excess grain to one of the three large terminals along the Minnesota River in Savage, Minnesota.

Beginning in 1991 or 1992, Kuenzel began using J&T to carry his surplus grain to the river terminals. After Kuenzel would call J&T to schedule a delivery, J&T would contact each of the river terminals to determine which was offering the highest price for grain. J&T would then pick up the grain at Kuenzel's farm and transport it, via a route entirely within Minnesota, to one of the three river terminals. Upon delivery, the grain would be unloaded, weighed and graded and a check would be issued to the J&T driver. The amount of the check less a shipping charge of twelve to fifteen cents per bushel would then be forwarded to Kuenzel.

Kuenzel knew that the three river terminals shipped their accumulated grain in barges on the Minnesota River to the Mississippi River. He also knew the grain he shipped would probably travel on a barge down the Mississippi River to other states. However, the final destination was of no concern to him. Rather, Kuenzel concerned himself with the best price for his grain which he knew came from the river grain

terminals including the Port Bunge terminal. Port Bunge ships over 99% of the corn it receives out of state by river barge.[1]

Once corn is delivered to the Bunge terminal, its connection to the farmer is severed. Incoming shipments are commingled and the fungible nature of corn makes it impossible to connect any particular shipment of corn to any individual farmer. After delivery to Bunge, Bunge controls all sales, uses and shipments of the corn. Most corn leaves the Port Bunge terminal for interstate ports within hours or days, however, some corn, particularly corn received late in the fall, may be stored until the following spring depending on market demands and the freezing of the Minnesota and Mississippi Rivers.

On or about October 31, 1994, Kuenzel determined that he had a corn surplus and therefore contacted J&T to arrange a delivery to one of the river terminals. Schubert, a driver for J&T, picked up the corn from Kuenzel's farm with the intention of delivering it to Port Bunge, approximately thirty miles away. On his way to Port Bunge, Schubert, while driving a 1983 Mack tractor bearing a United States Department of Transportation number and pulling a 1974 Dorsey trailer, both owned by J&T, collided with a car driven by Donley Allen Carlson. Carlson was killed in the collision.

---

[1]Bunge purchases agricultural commodities from farmers in one of two ways. Bunge purchases corn by way of cash contracts for future delivery which provide that the farmer will ship a certain number of bushels of the commodity within a certain time frame and will be compensated at a predetermined price. Bunge also purchases corn on a "spot basis" which essentially means that Bunge does not have a contract with the shipper and instead pays the rate at which its "market" closed the day preceding delivery. There is no record of Bunge ever entering into a contract with Kuenzel, thus any purchases by Bunge from Kuenzel would have been on a spot basis.

At the time of the accident, J&T had two separate insurance policies for their trucks. The first policy, issued by the State Farm Insurance Company, provided coverage limits of $100,000 and specifically covered the 1983 Mack truck and the 1974 Dorsey trailer. The vehicles covered under the State Farm policy, most notably the vehicle involved in the October 31, 1994 accident, were used for the transportation of goods only within the State of Minnesota.

The second policy, issued by Century, covered vehicles moving in interstate transport. These "interstate" vehicles did not specifically include the 1983 Mack truck or the 1974 Dorsey trailer. The policy provided $1,000,000 in liability coverage. As required by federal law, the Century policy included the "Endorsement for Motor Carrier Policies of Insurance for Public Liability Under Sections 29 and 30 of the Motor Carrier Act of 1980," also known as the "Form MCS-90." The Form MCS-90, a federal form promulgated and set out verbatim in the Department of Transportation Safety Regulation (49 C.F.R. § 387.15), amends the Century policy, "to assure compliance by the insured, within the limits stated herein, as a motor carrier of property, with Sections 29 and 30 of the Motor Carrier Act of 1980 and the rules and regulations of the Federal Highway Administration and the Interstate Commerce Commission (ICC)." These sections of the Motor Carrier Act and administrative regulations apply to motor carriers engaged in interstate commerce.

The MCS-90 provides a broad guaranty that the insurer will pay certain judgments incurred by the insured regardless of whether the motor vehicle involved is specifically described in the policy or whether the loss was otherwise excluded by the

terms of the policy.[2]   Century's MCS-90 endorsement contained coverage of $1,000,000.

Subsequent to the accident, Linda Michelle Carlson, individually and as trustee of the estate of Donley Allen Carlson, filed a complaint for wrongful death in Hennepin

---

[2]The Form MCS-90 provides in pertinent part:

In consideration of the premium stated in the policy to which this endorsement is attached, the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of sections 29 and 30 of the Motor Carrier Act of 1980 regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere.  Such insurance as is afforded, for public liability, does not apply to injury to or death of the insured's employees while engaged in the course of their employment, or property transported by the insured, designated as cargo.  It is understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, this endorsement, or any other endorsement thereon, or violation thereof, shall relieve the company from liability or from the payment of any final judgment, within the limits of liability herein described, irrespective of the financial condition, insolvency or bankruptcy of the insured.  However, all terms, conditions, and limitations in the policy to which the endorsement is attached shall remain in full force and effect as binding between the insured and the company.  The insured agrees to reimburse the company for any payment made by the company on account of any accident, claim, or suit involving a breach of the terms of the policy, and for any payment that the company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement.

49 C.F.R. § 387.15.

County District Court. Prior to trial, the parties reached a conditional settlement in the amount of a $1,200,000 judgment for Carlson, recoverable from insurance proceeds. The agreement provided she would recover $100,000 each from the Minnesota Insurance Company (for underinsured benefits), State Farm and Century. Payment of the remaining $900,000 available under the MCS-90 endorsement attached to Century's policy was specifically made contingent on the decision in this case.

## II. DISCUSSION

In the motion for summary judgment, Century sets forth a two-prong argument as to why the MCS-90 endorsement is not subject to recovery by Carlson. Century first contends that the MCS-90 only applies to interstate transportation; that the shipment from Kuenzel's farm to Port Bunge was intrastate; thus the value of the MCS-90 endorsement cannot be recovered by Carlson. Second, Century asserts that the MCS-90 endorsement does not apply to interstate commerce of corn because the ICC[3] does not have jurisdiction over the transportation of exempt agricultural products.

To the contrary, Carlson argues (1) that the corn shipment constituted interstate commerce; and (2) that shipments under interstate commerce are covered by the MCS-90, through the United States Department of Transportation authority, regardless of the product being transported.

The parties agreed and the district court determined this case to be an appropriate one for disposition by summary judgment.

---

[3]Effective January 1, 1996, the ICC was abolished and its duties were transferred to the Department of Transportation and the newly created Surface Transportation Board. See Pub. L. No. 104-88, 109 Stat. 803 (1995).

The first issue to be resolved is whether or not the tractor/trailer carried Kuenzel's corn on a trip in interstate or intrastate commerce. The district court determined as a matter of law in this case that the tractor/trailer carried the corn in intrastate commerce and accordingly ruled in favor of the insurer, Century. We review the case law and the crucial facts on this issue.

The district court cited the following four cases as important precedent in the determination of whether or not Kuenzel's corn shipped in the tractor or trailer traveled in intrastate or interstate commerce. We briefly review these cases. Roberts v. Levine, 921 F.2d 804 (8th Cir. 1990); Northwest Terminal Elev. Assoc. v. Minnesota Pub. Util. Comm., 725 F.2d 80 (8th Cir. 1984) (per curiam), aff'g, 576 F. Supp. 22 (D. Minn. 1983); State of Minnesota v. Roberts, 344 N.W.2d 407 (Minn. 1984) and State of Texas v. United States, 866 F.2d 1546 (5th Cir. 1989).

The tests articulated in each of the cases varies somewhat, in part based on the factual circumstances. Yet, each of these cases, including Roberts v. Levine, supports the determination that the grain in question in this case at the time of the accident traveled in interstate commerce. The appellant and the district court construed the decision in Levine to the contrary as applied to the facts.

In Levine, 921 F.2d at 812, the opinion in part reads:

It is well settled that the determination of whether transportation between two points in [a] State is interstate (or foreign) or intrastate in nature depends on the "essential character" of the shipment . . . . Crucial to this determination is the shipper's fixed and persisting intent at the time of the shipment . . . . Intent is ascertained from all the facts and circumstances surrounding the transportation.

Id. at 812 (quoting The May Dep't Stores Co. & Volume Shoe Corp., No. MC-C-30146 (I.C.C. June 7, 1990), 3 Fed. Carr. Cas. ¶ 37,823, ¶ 47,204).

In Levine, the plaintiff, Bob Roberts, a trucker, was issued a criminal misdemeanor complaint for operating a motor carrier for hire without a Minnesota permit. Id. at 805. The complaint consisted of two separate products and trips. Id. The first concerned the shipment of urea fertilizer by CF Industries from its Inver Grove Heights warehouse to one of its member cooperatives, the Sleepy Eye Elevator. Id. at 806. The second concerned shipments of soybeans from the Sleepy Eye Elevator to two soybean processing plants in Mankato, Minnesota, owned by Archer Daniels Midland ("ADM") and Honeymead Products Company ("Honeymead"). Id. All of the shipments at issue occurred entirely within the State of Minnesota and, in each instance, Roberts was hired and paid by the Sleepy Eye Elevator to transport the products at issue. Id. The plaintiff subsequently filed a declaratory judgment action to determine whether he was engaged in interstate commerce thus preempting Minnesota's jurisdiction over him. Id.

In analyzing the urea fertilizer shipment, this court found that the shipment from CF's warehouse to the Sleepy Eye Elevator constituted interstate commerce because CF, as the shipper, had the fixed and persisting intent, when it received the fertilizer in its warehouse via rail car from Canada, to continue the shipment to its member cooperatives. Id. at 814. This court was persuaded by the fact that CF controlled the production, shipment and subsequent sale of the fertilizer. Id. Thus, this court decided that CF intended to ship the fertilizer from Canada to its member cooperatives such as the Sleepy Eye Elevator, with the temporary storage detention in the warehouse merely serving to facilitate CF's ultimate delivery to its member cooperatives. Id.

Roberts also transported raw soybeans to two soybean processing plants in Mankato. Id. at 808-809. The raw soybeans were then processed into soybean meal and soybean oil. Id. at 808. The majority of the processed soybean products were shipped outside of the state. Id. at 809. This court found, inter alia, that the shipments to the processing plants were intrastate only because the shipper, the Sleepy Eye Elevator, did not have the fixed and persisting intent to ship raw soybeans in interstate

commerce.  Id. at 816.  An important element in the determination of the shipper's intent in that case was that the shipper sent raw soybeans which were converted to manufactured products, the latter shipped by the processor in interstate commerce.

This court in Levine also indicated that "the current test requires us to examine all of the 'facts and circumstances surrounding the transportation;' to focus on any one fact would violate this standard."  Id. at 814.

The Northwest Terminal Elev. Assoc. case presents very similar facts regarding transportation as to the situation here.  That case addressed whether truck shipments of grain to river terminals, including Port Bunge, constituted a part of interstate commerce such that the State of Minnesota was prohibited from regulating it.  Northwest Terminal Elev. Assoc., 725 F.2d at 80-81.  The river terminals receive grain in one of two ways.  In situations where the country elevators (the shippers), and the river terminals (the receivers), were not owned by the same company, the river terminals entered into contracts with the country elevators for delivery of grain in the future.  Northwest Terminal Elev. Assoc. v. Minnesota Pub. Util. Comm., 576 F. Supp. 22, 24 (D. Minn. 1983).  For the most part, the grain shipped from the country elevators fulfilled the delivery requirements established in the contracts.  Id.  In situations where the country elevators and the river terminals were jointly owned, the grain was shipped to the river terminals at a time deemed appropriate by the owner.  Id.  Since the river terminal owners by their purchases of grain from points within Minnesota intended to send the grain in interstate commerce, the district court determined that the shipments of grain wholly within the State of Minnesota by commercial truckers from the country grain elevators to the terminal elevators on the Minnesota and Mississippi Rivers, as well as Lake Superior, constituted interstate commerce.  Id.  Thus, the terminal elevator operators did not need to pay the truckers "a grain detention charge" for the time truckers wait at the elevator for their trucks to be unloaded--as required by regulations of the Minnesota Public Utilities Commission.

We stated in our opinion:

> According to the stipulation of facts, more than 98% of the grain received at the river and lake terminals to which the "detention charge" applies is shipped from those terminals to points outside Minnesota. Citing this fact, and applying the relevant case law, the district court in a thorough opinion concluded that the truck shipments of grain from the country elevators to the terminals "constitute the first leg of a large and constantly recurring course of interstate commerce," [Northwest Terminal Elev. Assoc., 576 F.Supp. at 25] and as such fall beyond the scope of the state's regulatory power. The [district] court rejected the contention of the Minnesota commission that the truck shipments were intrastate commerce because the initial shipper--the country elevator--intended no destination other than the terminal elevator located in Minnesota.

Northwest Terminal Elev. Assoc., 725 F.2d at 81.

In the State of Minnesota v. Roberts case, the Minnesota Supreme Court considered the interstate/intrastate nature of shipments of grain again to Port Bunge. The same Bob Roberts as in the Levine case disputed a charge against him of hauling grain without the required Minnesota permit. Roberts, 344 N.W.2d at 408. In this instance, Roberts hauled four truckloads of grain from the Revere Elevator to Port Bunge. Id. The shippers were Revere Elevator and/or Benson-Quinn Company, a grain brokerage company. Id. The four truckloads hauled by Roberts constituted a portion of a large sale of corn by Benson-Quinn to Bunge to fulfill a previous contractual obligation of Bunge for the sale of corn to the New Orleans export market. Id.

The Minnesota Supreme Court noted that whether commerce is interstate or intrastate must be determined by the "essential character of the commerce." Id. at 409. The court further found that the character of the shipment is determined from the evidentiary circumstances surrounding the movement. Id. "The facts of each case must

-11-

be evaluated to determine the essential nature of the contested shipments and whether they are intrastate." Id. The Minnesota Supreme Court determined that the relevant inquiry related to "the 'essential character of the commerce' and the intent of all the parties formed at the time of the initial movement. The intent element is to be gleaned from all the surrounding facts and testimony and not solely from the subjective intent of the original shipper." Id. at 410.

In analyzing the case, the Minnesota Supreme Court decided, as we did in Northwest Terminal, that the facts demonstrated a clear intent and purpose to ship grain to the river terminal to supply the demands of other states or foreign markets. Id. The court found it "of no consequence that the initial shipper . . . had no concern, connection with, or knowledge of the grain once it was delivered to the river terminal for shipment to the foreign markets." Id. at 410-11 (citation omitted). Accordingly, the court found the transport by Roberts constituted interstate commerce and thus Roberts had no need for a Minnesota permit. Id. at 411.

Century cites Atlantic Coast Line R.R. Co. v. Standard Oil Co., 275 U.S. 257 (1927), as supporting the intrastate nature of the grain transportation here. In that case, Standard Oil received large shipments of fuel oil and gasoline from Louisiana and New Jersey into its storage tanks near the Florida coasts. Id. at 262-63. Standard Oil then shipped the fuel oil and gasoline primarily to 123 bulk stations throughout Florida. Id. at 264. The fuel oil and gasoline were eventually transported to Standard Oil's customers by tank cars from the bulk stations. Id. The controversy arose when the Atlantic Coast Line Railroad Company charged interstate rates, which were higher than the previously charged intrastate rates, for the transport of the fuel oil and gasoline from the coastal storage tanks to the bulk stations entirely within the State of Florida. Id. at 266. The Court determined that the interstate transportation ended upon its delivery to the coastal storage tanks and that all subsequent distributions within the state were intrastate transportation. Id. at 267. We consider this case distinguishable because the oil shipment ended the interstate transportation of the fuel oil and gasoline when

-12-

Standard Oil Company received those fluids from the out of state points. At that time, a new transportation ensued when Standard Oil sent the products to the various storage tanks within the State of Florida.

Finally, in evaluating this case, we observe that the intent to move goods in interstate commerce or not turns in significant part on the factual context of each case. State of Texas, 866 F.2d at 1560.

Thus, we turn to an examination of whether any or all of the precedents we have cited apply to the shipment of the grain here in question. We closely examine the "essential character" of the shipment from the shipper's intent. See Levine, 921 F.2d at 812.

Over the past ten years, prior to 1995, Kuenzel had shipped eight or nine truckloads of excess corn to one or the other of the river terminals located near Savage, Minnesota on the Minnesota River. Those elevators are the Bunge terminal, the Cargill terminal, and the Continental terminal. Kuenzel has never shipped his excess corn to the local elevators at Platte, Glencore, or Cologne, Minnesota. The reason is that the prices at these elevators are lower than at the river terminals. Moreover, Kuenzel stated that he would not use J&T to take grain to local elevators but would be able to haul the grain himself with a tractor and wagon, although he has never done so.

Kuenzel relied on J&T to get him the best price at the river terminals. He knew that grain at the river terminals was loaded on barges and shipped on the Mississippi River probably as far south as New Orleans. He also knew his corn would not end up in Minnesota because the river terminals ship their grain by river. Thus, his interest in price related to the business of the river terminals which, at least inferentially, would pay a higher market price for the corn because of the interstate nature of its business.

As we have stated, Kuenzel relied on J&T to get him the best price.  In his deposition, Kuenzel testified he did not specifically recall whether he knew that the grain shipped on October 31, 1994 had a destination at the Bunge terminal, but he did know that he had shipped another load a day or two earlier and that load had gone to Bunge.  The following testimony seems very important.

Q Okay.  So you make the decision, the economic decision, to pay whatever it takes to get your shelled corn to the river terminals on the Minnesota River at Savage?

A. Right.  These smaller elevators really aren't designed to unload semi truckloads either so if it went there, I'd probably haul it myself with a tractor and wagon.

Jt. App. at 93 (Deposition of Randy Kuenzel).

Thus, although Kuenzel believed that his shipment traveled only in intrastate commerce because it did not cross any state line en route to the Bunge terminal, he nevertheless knew that (1) the corn had a destination outside of Minnesota, (2) the corn would go to one of the river terminals which supplied grain interstate and (3) he probably knew that the grain on the date in question had a specific destination of the Bunge terminal.

We reiterate that the Bunge terminal ships 99% of its grain out of the State of Minnesota by river barge.  The shipment destinations may be ports along the Mississippi River as far south as New Orleans.  Less than 1% of the grain remains in Minnesota.

In sum, the shipper Kuenzel intended his grain to go to a river terminal, in this case the Bunge terminal, and knew that the journey to that terminal was part of the interstate transportation of the grain itself, even though he had no control over where

-14-

Bunge would ultimately send the grain. Thus, as far as the test enunciated in <u>Levine</u> is concerned, Kuenzel had the "fixed and persistent intent" to send his grain to an interstate terminal where he knew it would be shipped to points beyond the State of Minnesota.

In coming to a contrary conclusion, the district court focused on the control that Kuenzel had over the grain from his farm to the Bunge elevator in determining that the transportation represented only intrastate commerce while the further transportation directed by Bunge represented interstate commerce. That analysis focuses on Kuenzel's subjective intent as he stated he thought his shipment was being made in intrastate commerce. His personal conclusions really become irrelevant. The crucial aspect of <u>Levine</u> focuses on the "essential character" of the shipment. Not whether the shipper thought he was sending his product in interstate or intrastate commerce. When Kuenzel shipped his product to Bunge, he knew it was the first leg of an interstate transportation and thus that aspect of his intent falls within the test outlined in the <u>Levine</u> case.

The determination that Kuenzel shipped his corn in interstate commerce is also supported by other case law. The determination of whether goods are transported in interstate commerce looks to whether the entire transportation was continuous. <u>See Middlewest Motor Freight Bureau v. ICC</u>, 867 F.2d 458 (8th Cir. 1989). Kuenzel's transportation of the goods to the Bunge terminal was only part of a continuous transportation of the goods out of the State of Minnesota. A shipment with a temporary stopover in one state continues to be an interstate shipment. <u>Roberts</u>, 344 N.W.2d 407.

Finally in <u>Northwest Terminal Elev. Assoc.</u>, 725 F.2d 80, this court held that shipments of grain wholly within the State of Minnesota by commercial truckers from country grain elevators to terminal elevators on the Minnesota and Mississippi Rivers and Lake Superior constitute interstate commerce. The key issue related to the fact that 98% of the grain received at those terminals is shipped from those terminals to points

-15-

outside Minnesota.  While none of the above cases specifically addresses the shipper's intent, it is clear that the shipper in sending the grain to those interstate terminals knew that the grain would be shipped out of state and that is the situation in the present case.

The district court relied upon Atlantic Coast Line.  However, the situation in that case is not analogous to the present case, where the shipment of grain was continuous from farmer to river terminal to out-of-state ports.  Here we have one transportation initiated by Kuenzel in which the goods would ultimately come to rest in places other than the State of Minnesota.  Kuenzel and the trucker knew the out of state destination of the corn.

Accordingly, we hold that the transportation of corn at the time of the accident constituted interstate transportation.  We reverse the district court on this issue.

As an alternative ground for affirmance, Century contends that even if Schubert was operating the truck in interstate commerce at the time of the loss, the transportation of corn represented an exempt commodity from ICC jurisdiction at the time of the accident and thus the Century policy is inapplicable.  This issue was not resolved by the district court.  Nevertheless, Century presented the issue to the district court and argues the issue as a basis for affirmance.  We therefore must resolve that question.

Century argues that the MCS-90 form does not apply to interstate commerce of exempt agricultural products because the ICC did not have jurisdiction over the transportation of exempt agricultural products.  We reject this contention.

Century's argument regarding the jurisdiction of the ICC is not supported by the enabling statutes and regulatory schemes of both the ICC and DOT.  The financial responsibility requirements that led to the adoption of the MCS-90 were originally promulgated in the Motor Carrier Act of 1980.  Section 30 of the Act mandated that motor carriers transporting persons or property in interstate commerce with a gross

-16-

weight rating of 10,000 pounds or more were required to obtain minimum levels of financial responsibility to cover public liability or property damage. See 49 U.S.C. § 31139. The DOT promulgated regulations requiring proof of financial responsibility which could be the MCS-90 Endorsement. 49 C.F.R. § 387.7. The ICC also adopted minimum financial responsibility requirements for interstate trucking pursuant to 49 U.S.C. § 31139.

The DOT regulations are broader than those of the ICC. The ICC did not implement its own endorsement, but rather adopted the DOT's MCS-90 endorsement for those motor carriers subject to the ICC regulations. Notice of Final Rules, 132 M.C.C. 948, 1982 WL 28482 at *1. The MCS-90 endorsement is not limited to those carriers subject to ICC jurisdiction. Rather, the MCS-90 endorsement explicitly applies in many situations (e.g., intrastate transportation of hazardous commodities and for-hire carriers) where the transportation falls outside the jurisdiction of the ICC. The MCS-90 endorsement applies notwithstanding that an interstate motor carrier transported an agricultural commodity.[4]

In addition, the underlying purpose of the financial responsibility requirements is to promote motor carrier safety and safety refers to the trucks themselves, not the

---

[4]DOT Chief Counsel Jerry Malone in a letter to Carlson's attorney dated September 19, 1996 stated the DOT's position on the issue of the scope of the MCS-90 endorsement. Malone wrote:

> A motor carrier using a vehicle with a gross vehicle weight rating of 10,000 pounds or more to transport property in interstate commerce is required to hold, and is covered by, a valid MCS-90 Endorsement, whether or not the property transported was exempt from economic regulation by the ICC.

Jt. App. at 141. We assume that this may be an agency interpretation. However, we do not rely on this opinion.

commodities being transported. See Royal Indem. Co. v. Jacobsen, 863 F. Supp. 1537 (D. Utah 1994). The exempt nature of the commodity has no bearing on the application of the MCS-90 endorsement. The DOT administers safety regulations and therefore DOT jurisdiction applies to the MCS-90. Once the endorsement is provided, it covers the truck in its interstate operations regardless of the commodity being transported.[5]

## III. CONCLUSION

The transportation of Kuenzel's corn by J&T at the time of the accident constituted interstate commerce. The DOT regulations require the use of the MCS-90 endorsement by trucks carrying 10,000 pounds or more, regardless of the type of commodity. Therefore the accident is covered by Century's MCS-90 endorsement and the district court's order granting summary judgment in favor of Century is reversed. We remand for entry of judgment in favor of Linda Michelle Carlson in accordance with the settlement agreement of the parties.

**LOKEN, Circuit Judge, dissenting.**

In this circuit, the critical inquiry in determining whether a shipment between two points in the same State is nonetheless interstate commerce focuses on "the shipper's fixed and persisting intent at the time of the shipment." Roberts v. Levine, 921 F.2d 804, 812 (8th Cir. 1990), quoting from a 1990 decision of the Interstate Commerce

---

[5]Century cites Branson v. MGA Ins. Co, 673 So. 2d 89 (Fl. App. 1996), as support for its argument that the MCS-90 endorsement does not apply to cases not within the ICC's jurisdiction. In Branson, the motor carrier transported potatoes within the State of Florida. We are not persuaded by this opinion because the court did not analyze the DOT regulations with the ICC regulations. In addition, the endorsement in Branson would not have applied because the transportation was intrastate commerce instead of interstate commerce.

-18-

Commission. In my view, the district court correctly analyzed farmer Kuenzel's fixed and persisting intent at the time he shipped corn for spot sale at the nearby Bunge terminal. I would therefore affirm for the reasons stated in that court's thorough Memorandum Opinion and Order of February 18, 1997. By focusing on farmer Kuenzel's *knowledge* of what would happen to his corn after he sold it, rather than his *intent* to sell it at a local marketplace, the court has expanded the concept of interstate commerce beyond what Congress and the responsible federal agency have determined to be a sensible division of federal-state regulatory responsibilities.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.